# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### June 23, 2015 Session

## STATE OF TENNESSEE v. DANNY SANTARONE

### Appeal from the Criminal Court for Sullivan County
### No. S60198     Robert H. Montgomery, Jr., Judge

_____

### No. E2014-01551-CCA-R3-CD – Filed October 1, 2015
_____

Defendant, Danny Santarone, was convicted of possession of dihydrocodeinone, oxycodone, cocaine, and heroin within 1000 feet of a school with the intent to sell or deliver. On appeal, Defendant argues that the evidence is insufficient to support his convictions and that application of the school zone enhancement violates public policy. Based upon a thorough review of the record, authorities, and arguments, we conclude that the evidence is sufficient to support Defendant's convictions and that his argument regarding the public policy behind the school zone enhancement is without merit. We therefore affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER, J., joined. NORMA MCGEE OGLE, J., concurred in results only.

Stephen M. Wallace, District Public Defender; William A. Kennedy, Assistant Public Defender (on appeal); and David Crockett, Elizabethton, Tennessee (at trial), for the appellant, Danny Santarone.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Barry Staubus, District Attorney General; and Kent Chitwood, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This is Defendant's direct appeal from his Sullivan County convictions for possession of various controlled substances within 1000 feet of a school with the intent to sell or deliver.

On February 15, 2012, the Sullivan County Grand Jury indicted Defendant for possession of dihydrocodeinone within 1000 feet of a school with the intent to sell or deliver, a Class C felony; possession of oxycodone within 1000 feet of a school with the intent to sell or deliver, a Class B felony; possession of drug paraphernalia, a Class A misdemeanor; possession of .5 grams or more of cocaine within 1000 feet of a school with the intent to sell or deliver, a Class A felony; and possession of heroin within 1000 feet of a school with the intent to sell or deliver, a Class A felony. Defendant was tried before a jury on March 5 and 6, 2013.

*Factual Background*

On Saturday, July 16, 2011, Matthew Henriksen, an operations manager with Federal Express ("FedEx") in Blountville, was monitoring a conveyor belt of newly-arrived packages when he noticed an envelope that was bulging open, revealing what appeared to be a large prescription bottle. The package was addressed to Defendant at an address in Johnson City. Upon further inspection, the label on the bottle appeared to be worn, and the packaging was inconsistent with a shipment from a pharmacy. Suspicious, Mr. Henriksen contacted Detective Burk Murray of the Sullivan County Sheriff's Office. Detective Murray asked Mr. Henriksen to try to identify the pills in the bottle. Mr. Henriksen pulled out of the bottle some brown paper, a clear bag with white powder in it, and some yellow pills that appeared to be consistent with Vicodin. Detective Murray then came and took possession of the package. Mr. Henriksen suggested that he could tell the intended recipient that the package had been delayed because the truck it was on had broken down.

After the scheduled delivery time of noon had passed, Defendant contacted FedEx and inquired about the package. The employee who spoke with him informed Defendant that the package had been delayed. Mr. Henriksen instructed the employee to let Defendant know that they would stay open thirty minutes after their normal closing time if he wanted to pick up the package that day, otherwise it would be delivered the following business day. Defendant insisted on picking the package up that day and asked for directions to the FedEx facility.

Mr. Henriksen called Detective Murray to let him know that Defendant would be coming to pick up the package. Detective Murray did not have time to set up a controlled delivery in a different county, so he brought the package back to the FedEx facility and Mr. Henriksen repackaged it. Detective Murray had patrol units set up on either side of the FedEx facility so that they would be able to intercept Defendant if he left in either

direction. Detective Murray parked in the parking lot next door so that he could observe when Defendant arrived.

Around 3:30 p.m., Defendant arrived with his daughter, Rachael Santarone.[1] The FedEx employees unlocked the door for them. Defendant signed for the package, took possession of it, and left. Mr. Henriksen called Detective Murray to let him know that Defendant left with the package. Detective Murray was able to identify Defendant from the driver's license photo that corresponded to the name and address on the package.

Officer Jessie Nunley of the Sullivan County Sheriff's Office parked his vehicle where he could observe Defendant's vehicle if he left the FedEx facility and headed toward the airport. Another officer set up on the other side of the FedEx facility in case Defendant left traveling in that direction. Detective Murray radioed that Defendant had left toward the airport and described his vehicle as a green Isuzu. Officer Nunley saw the vehicle pass his position, turned out behind it, and initiated a traffic stop. Defendant stopped his vehicle on Highway 75, and Officer Nunley directed him to pull over on a side street out of traffic. Both the initial stop location and the side street were within 1000 of the real property of Holston Elementary School.

Both Defendant and his daughter were removed from the vehicle and arrested. When the police officers searched the vehicle, they recovered the FedEx package from the center console, an ibuprofen bottle from the driver's side floorboard, and a Tylenol bottle, a small prescription bottle, a set of brass knuckles, and a cut off straw in Rachael's purse. The FedEx package contained a large prescription bottle in the name of Sabrina Fisher, two small baggies containing white powder, and a broken yellow pill. Agent Carl Smith, a forensic scientist with the Tennessee Bureau of Investigation, tested the various pills and powders found in Defendant's vehicle. Within the FedEx package, Agent Smith identified 110 tablets of dihydrocodeinone, 1.3 grams of cocaine, .14 grams of heroin, and 43 tablets of oxycodone; Agent Smith did not identify the broken yellow pill. The small prescription bottle found in Rachael's purse, which was labeled as a prescription of oxycodone for Linda Santarone, contained 59 and a half tablets of hydromorphone. The Tylenol bottle found in Rachael's purse contained 33 tablets of oxycodone. The ibuprofen bottle found on the driver's side floorboard contained 69 tablets of a different brand of oxycodone.

Rachael Santarone, Defendant's daughter and codefendant, testified for the State at trial. In December of 2010, when Rachael was eighteen years old, she came to live with her father and stepmother in Tennessee. Prior to that, she was living in Florida with her mother. She admitted that she was addicted to oxycodone and that her drug problem

---

[1] Due to witnesses having the same last name, we will refer to them by their first names for clarity. No disrespect is intended.

was the reason her parents decided that she should move away from Florida. However, Rachael would obtain pills from her father and her drug problem got worse while she lived with him. After their arrest, she moved out to live with her boyfriend.

Rachael testified that Defendant, her stepmother, and her adult stepsister were unemployed from the time she moved in in December 2010 until she and Defendant were arrested in July 2011. During this time, Defendant and her stepmother traveled to Florida about once a month. Upon their return, Rachael would notice both an increase in the number of visitors to their home as well as an improvement in the family's finances. The visitors would occasionally go to a back bedroom for a few minutes and then leave. On one occasion, Rachael was in the car with Defendant when he exchanged pills with a man for money, but she did not know the man's name or how many pills Defendant gave him. Rachael recognized the pills as oxycodone because she was addicted to them at the time. Rachael also recalled that Defendant often received packages from Florida. Some of these packages were addressed to Rachael, and she became upset with Defendant and asked him to tell his friends to no longer address the packages in her name.

On July 16, 2011, Defendant woke Rachael from a nap and asked her to go with him to the FedEx office to pick up a package. She was suspicious that the package contained drugs. Rachael entered the FedEx facility with Defendant. Defendant signed for the package, then brought it back to the car. He placed the package in the center console without opening it. Also in the center console were three smaller pill bottles. When Defendant was being pulled over by the police, he told Rachael to put the smaller bottles in her purse. She described the situation as "chaotic," and one of the bottles did not end up in her purse. She denied that the pill bottles were hers or that she knew they were in the car. She admitted that the brass knuckles and the straw found in her purse were hers and that she used the straw to ingest oxycodone.

Rachael made a statement to the police the day after her arrest. She denied that the police made her any promises in exchange for her statement. In exchange for her truthful testimony, Rachael pled to the reduced charges of possession of dihydrocodeinone, a Class D felony, and of possession of oxycodone, a Class C felony, as well as misdemeanor possession of drug paraphernalia and possession of a prohibited weapon. The charges of possession of cocaine and heroin for sale or delivery within 1000 feet of a school were dismissed. Rachael received a probationary sentence.

Defendant's wife, Linda Santarone, testified on her husband's behalf. She explained that she and Defendant had legitimate prescriptions for oxycodone to cope with the pain associated with various injuries. Even though they had been living in Tennessee for five years, Linda and Defendant still obtained their prescriptions from a pain management doctor in Florida. In 2011, they were each prescribed 360 oxycodone pills

and 90 Xanax per month.  She explained that the couple drove to Florida every month to obtain their pills as well as visit family and friends.

Linda testified that Defendant, who had made his living as a carpenter, was unable to work due to his various injuries.  She explained that they were able to pay for their medications and trips to Florida with money that Defendant received as an inheritance after his father passed away, as well as from buying and selling cars and jewelry and from back child support payments.  She denied that either she or Defendant sold any of their pills.

Linda explained that a lot of friends came to help around the house after Defendant broke his leg.  She denied that there would be an increase in visitors after the couple returned from Florida or that they would meet anyone privately in a back bedroom.  Even though Linda had earlier testified that she and Defendant always took all of their prescribed medication, she testified that both she and Defendant would regularly give pills to friends who said they were in pain, and the friends would repay them in kind once their own prescriptions had been filled.  She also testified that she noticed some of her pills would go missing in large quantities after Rachael moved in with the family.

On cross-examination, Linda admitted that Defendant was obtaining pain medication from a doctor in Tennessee after he broke his leg as well as continuing to obtain medication from the doctor in Florida.  By the time of trial, she and Defendant were no longer seeing the doctor in Florida and were obtaining their pills from a pain management doctor in Knoxville.  She denied that Defendant received regular packages from Florida but stated that Rachael often received packages.  Linda explained that they put the oxycodone pills in the Tylenol and ibuprofen bottles to try to hide them from Rachael.  She denied that the hydromorphone in the old oxycodone prescription bottle belonged to her.  Linda testified that Sabrina Fisher, the name on the large prescription bottle in the FedEx package, was the girlfriend of John Balmer, a friend of Defendant's from Florida.

Amber Phelps, Linda Santarone's daughter and Defendant's stepdaughter, also testified for the defense.  Ms. Phelps testified that she was the only one in the household who did not use drugs.  She admitted that her parents had a drug problem and that they would exchange pills with others who had prescriptions.  She denied that they ever bought or sold pills.  Ms. Phelps testified that she had seen her stepsister Rachael steal pills from her parents on a few occasions.  She said that Rachael was using both oxycodone and cocaine and that Rachael was getting the drugs in packages sent from Florida by Rachael's mother.  She characterized Rachael as a habitual liar.

Defendant testified on his own behalf.  He testified that he had various injuries from his years of working as a carpenter and that he could no longer work due to his

injuries. He was prescribed medication by a pain management doctor in Florida. Both he and his wife were prescribed 360 oxycodone pills per month. Defendant testified that he has since started seeing a doctor in Tennessee and that his prescription had been reduced to 148 pills per month.

Defendant testified that in July 2011, a friend of his from Florida named John Balmer was coming to Tennessee to visit Defendant. Defendant was expecting a package to be delivered to his house prior to Mr. Balmer's arrival. Defendant knew that the package was to be delivered on Saturday and that Mr. Balmer would be arriving a day or two after. When the package did not arrive as scheduled, Defendant called FedEx. He was told that the package could not be delivered because the truck had broken down and that he would have to pick up the package. Defendant drove to the FedEx facility with his daughter, Rachael, following the directions given to him over the phone. On cross-examination, Defendant testified that he was insistent on picking up the package that day because the FedEx employee did not provide a redelivery date and he wanted to be sure that he had the package when Mr. Balmer arrived.

Defendant denied that he put the drugs in Rachael's purse when they were pulled over, but admitted that he did have a bottle of oxycodone in the center console of the car. He stated that he had not opened the FedEx package and that he did not know what was inside of it. He explained that he intended to take the package home and store it until Mr. Balmer arrived. Defendant denied that he used heroin or hydrocodone. He admitted that he had been convicted of selling cocaine over 15 years ago but denied that he currently uses cocaine. Defendant admitted knowing that there would be prescription medication in the package, but denied knowing that the cocaine or heroin would be in there. He denied ordering any of the contents of the package.

The jury convicted Defendant as charged of possession of dihydrocodeinone within 1000 feet of a school with the intent to sell or deliver, possession of oxycodone within 1000 feet of a school with the intent to sell or deliver, possession of cocaine within 1000 feet of a school with the intent to sell or deliver, and possession of heroin within 1000 feet of a school with the intent to sell or deliver.[2] After a sentencing hearing, the trial court sentenced Defendant to concurrent sentences of 6 years for the dihydrocodeinone conviction, 12 years for the oxycodone conviction, and 25 years for both the cocaine and the heroin convictions. On July 11, 2014, the trial court denied Defendant's motion for a new trial. Defendant then filed a notice of appeal.[3]

_____

[2] Prior to trial, the State dismissed the charge of possession of drug paraphernalia.

[3] The State notes that Defendant's notice of appeal was filed one day late, but recognizes that this Court may waive the requirement for a timely notice of appeal "in the interest of justice." *See* Tenn. R. App. P. 4(a).

- 6 -

*Analysis*

On appeal, Defendant challenges the sufficiency of the evidence supporting his convictions and argues that application of the school zone enhancement in this case was against public policy because the location of Defendant's arrest[4] was chosen by law enforcement. The State responds that the evidence is sufficient to support Defendant's convictions and that the enhancement of Defendant's sentences was consistent with the Drug-Free School Zone Act. We will address each issue in turn.

*I. Sufficiency of the Evidence*

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Reid*, 91 S.W.3d at 277. Questions concerning the "credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

Defendant was convicted of four counts of possession of various controlled substances within 1000 feet of a school with the intent to sell or deliver. Under Tennessee Code Annotated section 39-17-417(a)(4), it is an offense for a person to knowingly possess a controlled substance with the intent to manufacture, sell, or deliver

---

[4] In his appellate brief, Defendant phrases this issue as the "location of the sale." However, we note that there was no actual sale in this case.

the controlled substance. If that possession occurs within 1000 feet of the real property of a school, the offense is punished one classification higher. T.C.A. § 39-17-432(b)(1). Dihydrocodeinone is a Schedule III controlled substance. *See* T.C.A. § 39-17-410. Oxycodone and cocaine are Schedule II controlled substances. *See* T.C.A. § 39-17-408. Heroin is a Schedule I controlled substance. *See* T.C.A. § 39-17-406.

In order to convict Defendant, the State was required to prove: (1) that he knowingly possessed the controlled substances; (2) that he possessed the controlled substances with the intent to sell or deliver them; (3) that he possessed the controlled substances within 1000 feet of the real property of a school[5]; and (4) with regard to the cocaine, that it weighed more than .5 grams. We note that a person may possess contraband alone or jointly with others, *State v. Richards*, 286 S.W.3d 873, 885 (Tenn. 2009) (citations omitted), and that possession of a controlled substance may be either actual or constructive, *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001).[6] "One's mere presence in an area where drugs are discovered, or one's mere association with a person who is in possession of drugs, is not alone sufficient to support a finding of constructive possession." *Id.* "Proof that a possession is knowing will usually depend on inference and circumstantial evidence. Knowledge may be inferred from control over the vehicle in which the contraband is secreted." *State v. Brown*, 915 S.W.2d 3, 7 (Tenn. Crim. App. 1995) (citing *United States v. Pierre*, 932 F.2d 377, 392 (5th Cir. 1991)). By proving that a defendant possessed drugs he intended to sell or deliver, the State necessarily proves knowing possession. *See* T.C.A. § 39-11-301(a)(2) ("intentional" includes "knowing"); *see generally State v. Marshall*, 870 S.W.2d 532, 538 (Tenn. Crim. App. 1993) ("By alleging that the defendant possessed cocaine which he intended to sell, the indictment necessarily implied that it was a knowing possession.").

Defendant does not contest that he knowingly possessed the various drugs found in his car; rather his argument on appeal is that the State failed to prove that he intended to sell or deliver those drugs. Under Tennessee Code Annotated section 39-17-419, the jury may infer "from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." The statutory definition of "deliver" includes "the actual, constructive, or

---

[5] The State need not prove that Defendant knew that he was committing an offense within 1000 feet of a school. *State v. Smith*, 48 S.W.3d 159, 169 (Tenn. Crim. App. 2000); *State v. Jenkins*, 15 S.W.3d 914. 917 (Tenn. Crim. App. 1999).

[6] A person constructively possesses a drug when the person has both the power and intention to exercise dominion and control over the drugs either directly or indirectly through others. *See State v. Patterson*, 966 S.W.2d 435, 444-45 (Tenn. Crim. App. 1997). In other words, constructive possession is the ability to gain actual possession over an object. *State v. Transou*, 928 S.W.2d 949, 956 (Tenn. Crim. App. 1996).

attempted transfer from one person to another of a controlled substance, whether or not there is an agency relationship." T.C.A. § 39-17-402(6); *see State v. Anthony Brown*, No. W2010-01764-CCA-R3-CD, 2012 WL 1154284, at *3 (Tenn. Crim. App. Mar. 30, 2012), *perm. app. denied* (Tenn. Aug. 16, 2012).

In the light most favorable to the State, the evidence shows that Mr. Henriksen, an operations manager at FedEx, noticed that a package addressed to Defendant had burst open and that it contained a large prescription bottle with a worn and out of date label not in Defendant's name. Mr. Henriksen notified Detective Murray about the suspicious package. Upon inspection, Mr. Henriksen discovered that the bottle contained a large amount of pills as well as some powder. The contents of the bottle were determined to be 110 tablets of dihydrocodeinone, 1.3 grams of cocaine, .14 grams of heroin, and 43 tablets of oxycodone.

Defendant called the FedEx facility inquiring about the package when it did not arrive as scheduled. An employee at FedEx told Defendant that the package had been delayed and that he could wait to have it delivered or pick it up from the facility that day. Defendant chose to pick up the package and asked for directions to the facility. A FedEx employee had to unlock the door for Defendant when he arrived because it was thirty minutes after their usual closing time. Detective Murray had officers posted on either side of the FedEx facility so that they would be able to stop Defendant regardless of which way he left. Officer Nunley pulled over Defendant after he left the FedEx facility, and the location of the stop was within 1000 feet of Holston Elementary School. Defendant's car was searched, and officers found three smaller bottles containing prescription pills in addition to the FedEx package.

Defendant's daughter, Rachael Santarone, was a passenger in the vehicle and was charged as a codefendant. She testified for the State that Defendant frequently made trips to Florida with his wife to obtain large quantities of prescription pain killers, which was confirmed by both Defendant and his wife. Rachael testified that the number of visitors to the house would increase after these trips and that the visitors would go to a back bedroom for a few minutes before leaving. Rachael also testified that on one occasion, she observed Defendant exchange a bag of oxycodone pills with a man for money. Defendant and his wife denied selling pills but admitted exchanging pills with friends on a regular basis. Rachael testified that, after they were pulled over by the police, Defendant attempted to throw the smaller pill bottles which had been in the center console into her purse and that, in the chaos, one did not make it in. Defendant admitted that he knew the FedEx package contained prescription medication and that he intended to hold the package until his friend arrived from Florida. Defendant denied knowing that the package contained cocaine or heroin.

Defendant's argument on appeal is that the only evidence establishing his intent to sell was the testimony of his daughter and codefendant, Rachael Santarone, who Defendant asserts was not a credible witness.[7] However, the assessment of the credibility of the witnesses and the weight and value of the evidence are entrusted to the jury as the trier of fact and will not be reevaluated on appeal. *Reid*, 91 S.W.3d at 277. Additionally, the jury could infer Defendant's intent to sell from the amount and variety of drugs contained in his vehicle along with other relevant factors. *See State v. Belew*, 348 S.W.3d 186, 190 (Tenn. Crim. App. 2005) (citing T.C.A. § 39-17-419). Inside Defendant's vehicle were over 300 prescription pills in multiple containers, including two different types of oxycodone pills, and neither of the prescription bottles were either current or in Defendant's name. Agent Smith testified that the packet of heroin contained a sufficient amount to produce multiple doses; the FedEx package also contained more than a gram of cocaine. Defendant denied that the drugs were for his personal use, and the only drug paraphernalia found in the car was a straw in Rachael's purse, which she admitted was hers. Defendant admitted that he gave pills to friends on a fairly regular basis, though he attempted to characterize these transactions as casual exchanges rather than sales. Rachael observed Defendant selling pills to a man in his car on one occasion and noticed an improvement in the family's finances after Defendant's many trips to Florida to obtain prescription pills. Defendant admitted that he knew the FedEx package contained prescription medication but denied that he knew it contained cocaine and heroin. A jury is free to accept portions of a witness's testimony and reject others. *See State v. Adams*, 45 S.W.3d 46, 56 (Tenn. Crim. App. 2000). Finally, Defendant admitted that he intended to hold the package until Mr. Balmer's arrival, thereby delivering the contents of the package to Mr. Balmer. From this evidence, a rational jury could reasonably conclude that Defendant possessed this vast and varied pharmacopeia with the intent to sell or deliver it.

## *II. Enhancement under the Drug-Free School Zone Act*

Defendant argues that the enhancement of his sentences under the Drug-Free School Zone Act was inappropriate and against public policy because the location of his arrest was chosen by law enforcement. The State responds that the statute does not mandate the tactics of law enforcement and foreclose the use of enhanced punishment when law enforcement tacitly allows drugs to enter a school zone. Moreover, the State

---

[7] We note that while Defendant challenges the credibility of Rachael's testimony, he does not argue that it is uncorroborated accomplice testimony. *See State v. Jones*, 450 S.W.3d 866, 888 (Tenn. 2014) (holding that "the uncorroborated testimony of one or more accomplices . . . is insufficient to sustain a conviction as a matter of law," but noting that "corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged.") We conclude that Rachael's testimony was adequately corroborated by the testimony of other witnesses. *See State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001).

argues that the evidence does not support Defendant's claim that law enforcement lured him into the school zone. We agree with the State.

Tennessee Code Annotated section 39-17-432, also known as the Drug-Free School Zone Act, states:

> A violation of § 39-17-417, or a conspiracy to violate the section, that occurs on the grounds or facilities of any school or within one thousand feet (1,000') of the real property that comprises a public or private elementary school, middle school, secondary school, preschool, child care agency, or public library, recreational center or park shall be punished one (1) classification higher than is provided in § 39-17-417(b)-(i) for such violation.

T.C.A. § 39-17-432(b)(1). Rather than creating a separate criminal offense, this statute "merely imposes a harsher penalty for violations of Tenn[essee] Code Ann[otated section] 39-17-417 occurring within a school zone." *State v. Smith*, 48 S.W.3d 159, 168 (Tenn. Crim. App. 2000); *see* T.C.A. § 39-17-432(b).

Defendant argues that because the General Assembly's goal in creating the Drug-Free School Zone Act was to keep illegal drugs off school grounds, any act by law enforcement that tacitly allows drugs to enter a school zone forecloses the use of the school zone enhancement. An appellate court's role in construing a statute is to give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope. *See State v. Butler*, 980 S.W.2d 359, 362 (Tenn. 1998). This Court should derive legislative intent from the natural and ordinary meaning of the statutory language within the context of the entire statute without any forced or subtle construction that would extend or limit the statute's meaning. *Id.* This Court will refer to the legislative history of a statute only when faced with ambiguous language. *State v. Hawkins*, 406 S.W.3d 121, 131 (Tenn. 2013). Moreover, this Court "will not apply a particular interpretation to a statute if that interpretation will yield an absurd result." *State v. Fleming*, 19 S.W.3d 195, 197 (Tenn. 2000).

Tennessee Code Annotated section 39-17-432 plainly and unambiguously states that the Act is intended "to serve as a deterrent" in order "to create drug-free zones for the purpose of providing vulnerable persons in this state an environment in which they can learn, play and enjoy themselves without the distractions and dangers that are incident to the occurrence of illegal drug activities" by imposing "enhanced and mandatory minimum sentences." T.C.A. § 39-17-432(a). The State is not required to prove that the defendant knew that he was committing an offense within 1000 feet of a school, nor even that school was in session at the time of the offense. *Smith*, 48 S.W.3d at 169. A defendant may be convicted under the Act if he was merely traveling through

the school zone while in possession of controlled substances, even if he was arrested elsewhere. *See State v. Vasques*, 221 S.W.3d 514, 523 (Tenn. 2007). This Court has explained the rationale for this rule:

> [R]egardless of a defendant's intent to distribute drugs within a school zone: "the mere presence of substantial quantities of drugs increases the risk of gunfire and other violence. . . . In addition, a person possessing drugs may abandon them while fleeing from the police. . . . The drugs may also be lost or stolen near a school and may then find their way into students' hands."

*Smith*, 48 S.W.3d at 169 (quoting *United States v. Rodriguez*, 961 F.2d 1089, 1094 (3d Cir. 1992)); *see also State v. Arturo Jaimes-Garcia*, No. M2009-00891-CCA-R3-CD, 2010 WL 5343286, at \*14 (Tenn. Crim. App. Dec. 22, 2010), *perm. app. denied* (Tenn. May 31, 2011).

Defendant has pointed to no authority that the legislature meant to foreclose the use of the school zone enhancement when law enforcement officers fail to prevent an offender from entering a school zone while in possession of drugs, and any interpretation of the statute in that manner would yield an absurd result. Defendant's argument would require the State to prove that he chose to be in the school zone while in possession of illegal drugs, which would require a showing of knowledge on Defendant's part. However, this Court has rejected that argument: "a requirement that the dealer know that a sale is geographically within the prohibited area would undercut [the] unambiguous legislative design [to create drug-free school zones]." *Smith*, 48 S.W.3d at 169 (quoting *United States v. Falu*, 776 F.2d 46, 50 (2nd Cir.1985)) (alteration in original). The Act is intended "to serve as a deterrent" to the "unacceptable conduct" of violating Tennessee Code Annotated section 39-17-417 within a school zone by imposing "enhanced and mandatory minimum sentences," not by mandating the tactics of law enforcement. *See* T.C.A. § 39-17-432(a).

Indeed, it appears that Defendant is simply making a "backdoor attempt" to argue entrapment, a defense which was specifically waived by Defendant at trial. *See State v. Jermaine Rashad Carpenter*, No. E2007-02498-CCA-R3-CD, 2009 WL 331330, at \*4 (Tenn. Crim. App. Feb. 11, 2009), *perm. app. denied* (Tenn. Aug. 17, 2009). While "[i]t is a defense to prosecution that law enforcement officials, acting either directly or through an agent, induced or persuaded an otherwise unwilling person to commit an unlawful act when the person was not predisposed to do so," T.C.A. § 39-11-505, the defense must be "fairly raised" by the evidence before the trial court is required to give a jury instruction on entrapment. *State v. Blackmon*, 78 S.W.3d 322, 331 (Tenn. Crim. App. 2001). We recognize that proof that the State lured a defendant into the school zone would "fairly raise" an entrapment defense; however, there was no such proof in this

case, and defense counsel specifically asked the trial court to remove entrapment from the jury instructions because it had not been raised by the proof.[8] *See State v. Charles Lincoln Faulkner*, No. E2006-02094-CCA-R3-CD, 2008 WL 2242531, at \*16 (Tenn. Crim. App. June 2, 2008). The evidence in this case demonstrates that Defendant insisted on picking up his package full of illegal drugs from the FedEx facility rather than wait for it the be delivered on a later date. Detective Murray, who was unaware of the route Defendant would travel, instructed officers to station themselves on either side of the FedEx facility. Detective Murray did not instruct the FedEx employee on which route to suggest to Defendant should he ask for directions. Defendant chose the route that he travelled after leaving the FedEx facility. Defendant argues that Detective Murray could have arrested him in the parking lot of the FedEx facility, which was not in a school zone. However, Detective Murray was conducting surveillance while other officers were prepared to stop and arrest Defendant's vehicle. And, as noted above, Defendant has pointed to no authority that the Drug-Free School Zone Act requires law enforcement officers to actively attempt to prevent a defendant from bringing illegal drugs into a school zone. Defendant's argument is without merit.

*Conclusion*

Based on the foregoing, we affirm the judgments of the trial court.

_____
TIMOTHY L. EASTER, JUDGE

---

[8] Notice of an entrapment defense had been properly filed before trial. *See* T.C.A. § 39-11-505.

- 13 -